**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| ALEXANDER LANZ,<br>ALYSSA GREENE,<br>SHANAYA DESSIN, and<br>VINCENT LEIJA, individually and on behalf of a class of similarly situated individuals, | : | CASE NO. 1:23-CV-05344-LMM |
| Plaintiffs, | : | COMPLAINT – CLASS ACTION |
| v. | : | JURY TRIAL DEMANDED |
| LHNH LAVISTA LLC,<br>LHNH LAVISTA TIC II LLC,<br>LHNH LAVISTA TIC III LLC,<br>SILVERPOINT MANAGEMENT, LLC, and<br>AVENIUM GROUP, LLC, | : | |
| Defendants. | : | |

**AMENDED CLASS ACTION COMPLAINT**

COME NOW the Plaintiffs Alexander Lanz, Alyssa Greene, Shanaya Dessin, and Vincent Leija, individually and on behalf of a class of similarly situated individuals, and files this amended class action complaint against the above-named Defendants who owned and/or operated the apartment complex known as The Reserve at LaVista Walk – which is located at 1155 LaVista Road NE, Atlanta, Georgia 30324 – and/or whose negligence contributed to the fire that

started on November 10, 2023, that resulted in the total loss of Buildings One and Two, which housed approximately 284 units in Atlanta, Georgia, along with the personal belongings of hundreds of residents. This lawsuit seeks to make whole Plaintiffs and those similarly situated for everything lost in the fire and all cognizable damages to the fullest extent allowed by law.

## PARTIES

1.

Lanz is a resident of Fulton County and submits to the jurisdiction of this Court.

2.

Greene is a resident of Fulton County and submits to the jurisdiction of this Court.

3.

Dessin is a resident of Fulton County and submits to the jurisdiction of this Court.

4.

Leija is a resident of Fulton County and submits to the jurisdiction of this Court.

5.

Lanz, Greene, Dessin, and Leija represent a putative class of similarly situated individuals who are residents of Fulton County and lived in Buildings One and Two at The Reserve at LaVista Walk at the time a fire started on the roof on November 10, 2023.

6.

LHNH LAVISTA LLC is a New Jersey limited liability company with its principal place of business in Jackson, New Jersey. This Defendant may be served by personal service of process upon its registered agent, Vcorp Agent Services, Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

7.

LHNH LAVISTA TIC II LLC is a New Jersey limited liability company with its principal place of business in Jackson, New Jersey. This Defendant may be served by personal service of process upon its registered agent, Vcorp Agent Services, Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

8.

LHNH LAVISTA TIC III LLC is a New Jersey limited liability company with its principal place of business in Jackson, New Jersey. This Defendant may be

served by personal service of process upon its registered agent, Vcorp Agent Services, Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

9.

Silverpoint Management, LLC, is a New Jersey limited liability company with its principal place of business in Lakewood, New Jersey. This Defendant may be served by personal service of process upon its registered agent, Vcorp Agent Services, Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

10.

Avenium Group, LLC, is a New Jersey limited liability company that is not registered to do business in Georgia with the Secretary of State. Its principal place of business is in Jackson, New Jersey. This Defendant may be served with personal service of process upon its registered agent, Yakov Stein, 2105 W. County Line Road, Ste. 3, Jackson, New Jersey 08527.

## JURISDICTION AND VENUE

11.

This action has more than one hundred putative class members, the parties are minimally diverse, and the matter of controversy is in excess of $5 million.

12.

As a result, this Court has original diversity jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), (d)(5). *See also Standard Fire Ins. Co. v. Knowles*, 568 U.S 588 (2013).

13.

Venue is appropriate in the Northern District of Georgia, Atlanta Division, because "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" within the bounds of the Atlanta Division, and all Plaintiffs reside therein. 28 U.S.C. § 1391; N.D. Ga. L.R. 3.1(B).

**OUT-OF-STATE INVESTORS PURCHASE THE RESERVE AT LAVISTA WALK WITH THE INTENTION TO PUT PROFIT ABOVE PEOPLE**

14.

LHNH LAVISTA LLC, LHNH LAVISTA TIC II LLC, and LHNH LAVISTA TIC III LLC (collectively, "the LHNH Defendants") purchased The Reserve at LaVista Walk for $90 million in December 2021.

15.

Defendants financed $70 million of the purchase price and had investor funds of at least $17 million.

16.

Defendants are owned and operated by a common organization that is, or is associated with, Silverpoint Management, LLC ("Silverpoint").

17.

Silverpoint has been associated with numerous LHNH entities that owned numerous apartment complexes in Georgia,[1] North Carolina,[2] and, upon information belief, a number of other states.

18.

Upon information and belief, as of November 10, 2023, Silverpoint owned and operated, through several other companies, The Reserve at LaVista Walk and Alexander at the District, the latter of which is owned by LHNH Alexander, LLC.

---

[1] These entities included, among others, LHNH Alexander LLC; LHNH Chatsworth LLC; LHNH Columns LLC; LHNH Creekside Apartments, LLC; LHNH Ellington Midtown LLC; LHNH Parkside Apartments LLC; LHNH PARKWAY VISTA LLC; LHNH Perimeter LLC; LHNH Riverhaus LLC; LHNH Terraces LLC; LHNH The Vine LLC; LHNH THE VUE LLC.

[2] These entities included, among others, LHNH – PP Apts. LLC; LHNH-86 LLC; LHNH BRENTMOOR LLC; LHNH – THE BRITTANY LLC; LHNH – Country Club Apartments LLC; LHNH Cresent Oaks LLC; LHNH Enterprise, L.L.C.; LHNH Heritage LLC; LHNH – Northwoods Townhomes NC LLC; LHNH-The Pines LLC; LHNH Summerlyn Place LLC.

19.

Upon information and belief, as of November 10, 2023, Silverpoint had divested itself of the other LHNH-owned properties in Georgia.

20.

Upon information and belief, Defendants represent investors, purchase multi-family dwelling properties, and execute a blueprint of tasks aimed at cutting costs, increasing revenue, and creating the façade that they improved the property during their ownership.

21.

Among other things, Defendants cut costs by refusing to pay vendors and suppliers; cutting services such as security, garbage collection, groundskeeping, and pest control; and falsely and fraudulently taking funds from residents, refusing to give appropriate refunds, and/or auto-drafting funds that are not actually owed.

22.

Defendants' pattern and practice of acquiring and flipping properties has left a trail of havoc and destruction. Evidence of this pattern and practice includes a trail of lawsuits, which include:

(a) *44 Appliance & Supply Company, Inc. v. LHNH Alexander, LLC & Silverpoint Management, LLC*, Gwinnett State Court, Case No. 23-C-07919-S1 (collection for $29,324.36 by appliance supplier);

(b) *Alston v. Silverpoint Management, LLC*; Gwinnett Magistrate Court; Case No. 19M45890 (resident complaint related to pests and non-functioning equipment in unit);

(c) *Billingsly v. Silverpoint Management, LLC*; Gwinnett Magistrate Court; Case No. 23M38386 (resident complaint related to pests);

(d) *Salo v. Reserve at La Vista Walk & Silverpoint Management*; Fulton State Court; Case No. 23EV002570 (resident complaint related to false/fraudulent collection);

(e) *Simpson v. Avenimum Property Management*; Gwinnett Magistrate Court; Case No. 23M16756 (resident complaint related to pests); and

(f) Weatherly v. LHNH THE VUE, LLC, et al.; Dekalb State Court; Case No. 23A03595 (negligent security and wrongful death).

23.

Defendants carried out the same blueprint of cost-cutting at The Reserve at LaVista Walk.

24.

In an Holdfolio[3] investor video regarding The Reserve at LaVista Walk,[4] Yakov Stein – suspected manager of all Defendants and all LHNH entities referenced in footnote 1 above – stated that the apartment was an "A-plus-plus asset"; Holdfolio highlighted Mr. Stein's plan to "increase the rents and to force-appreciate" the asset; and boasted that, "from a deferred maintenance perspective, these units can survive another 10-15 years the way they are."[5]

25.

These comments by Mr. Stein were false and misleading, apparently with the intention to deceive investors.

26.

The truth, however, was that The Reserve at LaVista Walk was in dire need of maintenance and upkeep.

[3] Holdfolio identified itself as a partner of Mr. Stein.

[4] The video is available at https://youtu.be/eAPSOMRLhJA.

[5] The video also mentioned that 85% of the floors had been replaced or refurbished. Plaintiffs have photographs of substantial flooding damage in the complex, so this claim is incredulous.

27.

To cut costs, Defendants created a culture of frugality, ignored residents' complaints, and knowingly put residents at risk.

28.

Defendants refused to fix broken security doors, and homeless individuals were frequently inside the building.

29.

One resident who complained about the risks associated with homeless individuals inside the building was told by Defendants, through agents, that the complex had "compassion" so did not eject those people or otherwise prohibit their access to the building.

30.

Residents complained to Defendants, through agents, that residents and non-residents were able to access the roof, ignite fireworks, and discharge firearms.

31.

At least one resident reported Charnelle Gunn as posing a safety threat to residents.

32.

Notwithstanding Defendants' knowledge that individuals were accessing the roof, discharging fireworks and firearms thereon, and that Charnelle Gunn was a safety threat, Defendants took no action to prevent roof access or to prepare for the possibility of fire on the roof.

33.

Before the summer of 2022, a vehicle crashed into the apartment complex damaging a portion of outer wall, exposing a water suppression system pipe and valve, and causing flooding.

34.

Upon information and belief, the vehicle collision into the apartment complex caused damage to the fire suppression system's wiring system and, thereafter, the apartment frequently had false fire alarms go off.

35.

The damaged outer wall from the vehicle crash allowed homeless people to access a valve to turn on a fire suppression system sprinkler head and shower in the water therefrom.

36.

Apartment employees identified a panel that would properly cover the pipe and valve, but Defendants refused to pay for it; instead, they locked the valve with a bike lock.

37.

Defendants also used bike locks for other purposes, such as locking a fire escape – that caused distress to a young woman with a five-month-old child trying to escape the fire – and locking a gate to a pool that posed the threat of chemical burns due to the improper application of pool chemicals.

38.

In June 2022, Century Fire Protection, LLC ("Century"), diagnosed two broken control valves that controlled the pressure within the fire suppression system.[6]

[6] Upon information and belief, fire personnel reported via radio that there was no pressure within the fire suppression system and aerial access via ladders were needed to properly combat the fire. At 10:46 p.m. on November 10, 2023, fire personnel reported that the fire suppression system's standpipe was not flowing water.

39.

Century warned Defendants that the broken control valves meant that the pressure within the fire suppression system could not be guaranteed or maintained.

40.

Upon information and belief, immediately after the two broken control valves were diagnosed, the fire suppression system failed inspection.[7]

41.

Upon information and belief, Century did not return to the apartment complex after June 2022 because Defendants refused to pay an invoice.

42.

Century and numerous other vendors filed liens on unpaid invoices that Defendants accumulated in their effort to re-sell the property for a substantial profit.

[7] Plaintiffs are aware that the fire suppression system allegedly passed an inspection in December 2022. This is perplexing; however, Plaintiffs note that the Century lien is dated after the alleged inspection. The referenced inspection report has not yet been provided to Plaintiffs.

43.

On or about December 24-25, 2022, the fire suppression system froze and caused flooding again.

44.

Defendants were also aware of damaged and corroded sprinkler heads throughout the hallways of Buildings One and Two.

45.

Plaintiff Dessin posted a Google review in October 2023 stating, "[T]he most concerning issue is the non-functional fire sprinkler system within the complex. It has been down for over a year, leaving us at an extremely high risk in the event of a fire."[8]

46.

Plaintiffs and numerous residents complained extremely frequently about pests, mold, myriad security concerns, false fire alarms, and homeless people in the building – including some homeless people living in vacant units.[9]

---

[8] Compare this review to reviews of Alexander at the District in Atlanta, Northwoods Townhomes in Cary, North Carolina, and the mountain of other consistent and negative reviews about Silverpoint.

[9] This did not stop Defendants from filing many evictions against residents who paid rent *at least once* across LHNH properties.

47.

Plaintiff Lanz sent Defendants, through agents, a scathing resignation letter highlighting a vast list of complaints and concerns about the apartment complex.

48.

On October 4, 2023, Plaintiff Lanz sent an email to Defendants, through agents, noting "the second night this happened" and complained that "3 back-to-back alarms in the middle of the night" interfered with the residents' ability to sleep.

49.

Defendants had knowledge the fire alarm pull-down boxes and fire extinguishers had not been properly inspected and/or were not all operating.

50.

Defendants had specific knowledge that the fire suppression system was not adequate and not functioning.

51.

Defendants made the conscious choice to not repair the fire suppression system to maximize profits to investors.

**<u>THE RESERVE AT LAVISTA WALK'S INVESTORS LEFT THE RESIDENTS TO BURN</u>**

52.

On or about November 10, 2023, apartment resident Charnelle Gun along with Skye Joiner and Robert Stokes accessed the roof and, upon information and belief, discharged fireworks.

53.

Upon information and belief, the fire started substantially before 10:30 p.m.

54.

Upon information and belief, leasing agent Deyse Mejia was contacted and informed of the fire by a resident.

55.

Upon information and belief, Mejia did not live on-site at the time of the fire but may have been spending the night with another leasing agent.

56.

Upon information and belief, Mejia accessed the roof and attempted to put out the fire.

57.

Upon information and belief, emergency personnel were notified of the fire at approximately 10:30 p.m.

58.

Upon information and belief, Mejia sent a video of the roof fire – which was burning in a circular pattern – to co-workers around 10:43 p.m.

59.

Meija stated that the fire suppression fire alarm did not automatically sound.

60.

Upon information and belief, the fire alarm was not sounding when fire personnel arrived.

61.

According to what is currently available to Plaintiffs, the earliest evidence of the fire alarm sounding is 10:53 p.m.

62.

Apartment leasing agents, all of whom were on-site although not all of them lived on-site,[10] manually pulled a fire alarm at a pull box – it is unclear if the fire alarm was not functioning from negligence or had been intentionally disabled as a result of complaints regarding the false alarms.

63.

Prior to November 10, 2023, the fire alarm had gone off numerous times and Defendants falsely told residents that the false alarms were occurring because the system was being tested.

64.

Dozens – reportedly by one resident, more than one hundred – false alarms from the time of the vehicle collision until November 10, 2023, caused many residents to disregard the fire alarm.

65.

Likely knowing that the false alarms created a "boy that cried wolf situation," an Atlanta Police Department ("APD") officer who also lived in the building went door-to-door to inform residents the building was on fire.

[10] Residents report that the two leasing agents who do not live on-site are infrequently, if ever, seen at the complex after 6:00 p.m., and residents found it extremely peculiar that they were on-site at the time of the fire before fire personnel.

66.

The APD officer did not have time to take care of his own apartment unit due to his decision to inform residents of the fire; due to his heroism and sacrifice, no one died in the fire, but his pet cat died, and he lost all of his personal belongings.

67.

By the end of November 11, 2023, Building One had collapsed and was known to be a total loss and in need of condemnation.

68.

Building One residents could not return to their units.

69.

Shortly after the fire, Building Two residents were told that they could not return to the property.

**EVEN AFTER THE FIRE, DEFENDANTS AND INVESTORS CONTINUED TO FOCUS ON PROFIT ABOVE PEOPLE**

70.

After the fire, Defendants sent an email to residents of Buildings One and Two stating that Building One residents did not need to pay rent, but was silent as to whether Building Two residents needed to pay rent.

71.

Due to the concern that Defendants would auto-draft future rent payments, residents began removing their credit card information from the online payment portal.

72.

Online payment portal access was disabled for some residents, so many of those individuals had to contact their banks to dispute any future charges from the apartment.

73.

Defendants, via their vendor Conservice, LLC, sent rent and service charge bills to Building Two residents after the fire while said residents remained unable to enter the building or access their belongings.

74.

December 2023 rent was auto drafted from at least one resident's bank account.

75.

Defendants have not returned pro-rated rent for November 11, 2023, forward, even though Buildings One and Two have not been accessible and residents of all units have been displaced since that time.

76.

Defendants have not returned security deposits or any other funds that were not associated with past rent legitimately owed to Defendants.

77.

Defendants established a GoFundMe seeking $5 million for the residents related to the fire and, to date and to Plaintiffs' knowledge, none of those funds have been given to residents.

78.

Residents are in dire need of the funds held by Defendants from the GoFundMe, security deposits, and rent beyond November 11, 2023 – some residents continue to sleep in their cars as they are unable to secure replacement housing.

79.

The apartment's TikTok page followed TikTok accounts of residents after the fire, making those individuals feel intimidated and/or that the action was otherwise inappropriate.

80.

Defendants, through agents, notified Building Two residents that residents of two floors could access their belongings on November 22, and residents of the

other two floors could access their belongings on November 23, but would first have to sign a release that would not be provided in advance of their arrival at Building Two.

81.

Subsequently, Defendants, through agents, changed the schedule of access to Building Two several times. Some residents secured moving vans for earlier in the week and had their scheduled time moved to after Thanksgiving, requiring them to incur additional charges with moving companies.

82.

On November 20, 2023, Defendants attempted to coerce residents into signing a full liability release that included the waiver of “the right to sue the owner” to allow them to enter Building Two to retrieve whatever is left of their belongings, including family heirlooms and sentimental items.

83.

On November 20, 2023, Defendants also threatened residents with arrest if they attempted to enter the property to retrieve their belongings without signing the coercive release.

84.

Under duress, some residents – although not Plaintiffs – may have signed the release.

85.

In a video recording following the fire, Meija stated that the apartment is understaffed because the employees were "emotionally unavailable."

86.

Due to the understaffing and failure to ensure appropriate security, Building Two has been looted and individuals may be living therein.

87.

Residents have not been allowed to return to their units even though many of them know that their units were looted.

88.

Residents are not able to make police reports because they cannot confirm whether they have been looted and/or they do not know what items have been looted.

89.

Defendants have engaged BluSky Restoration Contractors, LLC ("BluSky") to demolish and/or restore the property; the plan to do so at this time without allowing Plaintiffs to inspect the property will constitute spoliation of evidence.

90.

Upon information and belief, Defendants have already altered the scene to destroy evidence and hamper Plaintiffs' ability to investigate this matter.

91.

Numerous residents have recently been surprised to learn that Defendants misrepresented the nature of the renters' insurance required by the complex.

92.

Although Defendants informed residents that the monthly renters' insurance required by the apartment is all that is needed[11] – and even encouraged one resident to terminate her other renters' insurance in October 2023 – the referenced insurance only covers the Defendants' loss; it does not cover loss claims by residents.

---

[11] Plaintiffs have been informed of renters' insurance premiums varying from $15.00 to $25.00 monthly.

93.

As a result of Defendants' negligent and fraudulent actions, some residents are not covered by renters' insurance.

**CLASS ACTION ALLEGATIONS**

94.

Plaintiffs bring this action as a putative class action and proposes one class.

95.

Plaintiffs propose the following class, while reserving the right to modify this definition:

> All individuals who (a) resided in Building One or Building Two at The Reserve at LaVista Walk on November 10, 2023, and (b) suffered personal property damage as a result of the fire that took place on November 10, 2023, and/or (c) have not been provided a return of their security deposit and/or pro-rated rent from November 11, 2023, forward.

96.

Plaintiffs propose certification on all issues, while reserving the right to seek, in the alternative, certification as to any specific issue, claim, or defense.

97.

This action has been brought and is properly maintained as a class action as it satisfies the numerosity, commonality, typicality, and adequacy-of-representation requirements of Fed. R. Civ. P. 23.

98.

Plaintiff alleges that hundreds of individuals who resided at The Reserve at LaVista Walk on November 10, 2023, have been displaced and lost substantial personal property resulting in damages related to the replacement cost of personal property, loss of use of said property, lost wages, loss of capacity to earn wages, and other compensatory damages.

99.

The class members are so numerous that joinder is impracticable. Upon information and belief, Buildings One and Two at The Reserve at LaVista Walk had 284 units, approximately 74.56% occupancy, and approximately 243 residents.

100.

Plaintiffs' claims are typical of the claims of the putative class. Because Plaintiffs were harmed by the same fire resulting from Defendants' negligence that harmed the class, Plaintiffs were subject to conduct that is typical of the rest

of the class.

101.

Plaintiffs would adequately protect the class's interests. Plaintiffs have genuine interest in protecting the rights of the class and Plaintiffs' counsel is experienced in handling complex class actions. Because Plaintiffs seek recourse related to a fire that harmed all class members, the interests of Plaintiffs and the class are aligned.

102.

Questions of law and fact common to the putative class exist that predominate over questions affecting only individual members including but not limited to whether Defendants were grossly negligent and wantonly reckless by refusing, for financial reasons, to secure a functional fire suppression system. A finding of liability in favor of Plaintiffs would establish Defendants' liability on behalf of all class members damaged by the fire.

103.

A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Given the dollar amounts at stake, a class action is likely the only way for Plaintiff and other class members to obtain any redress.

104.

The prosecution of separate actions by or against individual members of the class would create a risk of "(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; [and] (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]" Fed. R. Civ. P. 23(b)(1).

105.

Defendants opposing the class have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. Fed. R. Civ. P. 23(b)(2).

**COUNT ONE**

Negligence, Gross Negligence, and Negligence Per Se

106.

Defendants had a legal duty to exercise reasonable or ordinary care to protect the residents of The Reserve at LaVista Walk from unreasonable risk of harm from fire.

107.

Defendants breached their legal duty by failing to ensure the fire suppression system was operational and sufficient.

108.

Defendants are "responsible for damages arising from defective construction or for damages arising from the failure to keep the premises in repair." O.C.G.A. § 44-7-14.

109.

Defendants' negligence caused Plaintiffs and those similarly situated to suffer significant loss of personal property, loss of use of said property, lost wages, inconvenience, and compensatory damages.

110.

The Defendants' actions show wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs and the putative class to an award of attorney fees and punitive damages pursuant to applicable law.

111.

Defendants acted in bad faith in the underlying transaction by pursuing profits over safety and have caused Plaintiffs and the putative class unnecessary trouble and expense. As such, Defendants are liable for Plaintiffs' expenses of litigation, including reasonable attorney fees.

**COUNT TWO**

Nuisance

112.

Defendants' failure to maintain an adequate and operational fire suppression system caused hurt, inconvenience, and damage to Plaintiffs.

113.

Plaintiffs are entitled to all nuisance damages against Defendants as allowed by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand a TRIAL BY JURY and the following relief:

(a) Compensation for all financial losses that resulted from the fire, including the cost to replace all destroyed personal property, loss of use of said property, lost wages for time missed from work to relocate, and expenses related to purchasing replacement items, temporary substitute housing, and permanent substitute housing;

(b) Compensatory damages in an amount to be determined by the enlightened conscience of the jury to fully compensate Plaintiffs and those similarly situated;

(c) Award of costs and expenses of this action, together with reasonable attorney and expert fees;

(d) Punitive damages in an amount to be determined by the enlightened conscience of the jury sufficient to punish Defendants for their conduct toward Plaintiffs and those similarly situated and deter Defendants from similar conduct in the future;

(e) Judgment against Defendants for damages incurred by Plaintiffs and those similarly situated;

(f) Judgment against Defendants in an amount to fully and adequately compensate Plaintiffs and those similarly situated;

(g) An award of pre-judgment and post-judgment interest;

(h) A trial by jury on all issues triable to a jury; and

(i) Other and further legal and equitable relief as the Court deems just and proper.

Respectfully submitted this 28th day of May 2024.

By: /s/ Douglas H. Dean
Georgia Bar No. 130988
Attorney for Plaintiffs
Dean Thaxton, LLC
601 E. 14th Avenue (31015)
Post Office Box 5005
Cordele, Georgia 31010
T: (229) 271-9323
F: (229) 271-9324
E: *doug@deanthaxton.law*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing AMENDED CLASS ACTION COMPLAINT has been prepared with 13-point Book Antiqua font, which is one of the font and point selections approved by this Court in Local Rule 5.1(B).

This 28th day of May 2024.

By: /s/ Douglas H. Dean
Georgia Bar No. 130988
Attorney for Plaintiffs
Dean Thaxton, LLC
601 E. 14th Avenue (31015)
Post Office Box 5005
Cordele, Georgia 31010
T: (229) 271-9323
F: (229) 271-9324
E: *doug@deanthaxton.law*

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date electronically filed the foregoing AMENDED CLASS ACTION COMPLAINT with the Clerk of Court using the CM/ECF system which will automatically provide notice of such filing via electronic mail to the following attorneys of record:

R. Matt Shoemaker
JONES CORK, LLP
Truist Bank Building
435 Second Street, Fifth Floor
Post Office Box 6437
Macon, Georgia 31208
*matt.shoemaker@jonescork.com*

This 28th day of May 2024.

By: /s/ Douglas H. Dean
Georgia Bar No. 130988
Attorney for Plaintiffs
Dean Thaxton, LLC
601 E. 14th Avenue (31015)
Post Office Box 5005
Cordele, Georgia 31010
T: (229) 271-9323
F: (229) 271-9324
E: *doug@deanthaxton.law*