**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| ALEXANDER LANZ, et al.<br><br>Plaintiffs,<br><br>v.<br><br>LHNH LAVISTA LLC, et al.<br><br>Defendants. | Case No. 1:23-cv-05344-LMM |

## SECOND AMENDED CLASS ACTION COMPLAINT

COME NOW the Plaintiffs Alexander Lanz, Alyssa Greene, Shanaya Dessin, and Vincent Leija, individually and on behalf of a class of similarly situated individuals, and files this second amended class action complaint against the above-named Defendants who owned and/or operated the apartment complex known as The Reserve at LaVista Walk – which is located at 1155 LaVista Road NE, Atlanta, Georgia 30324 – and/or whose negligence contributed to the fire that started on November 10, 2023, that resulted in the total loss of Buildings One and Two, which housed approximately 284 units in Atlanta, Georgia, along with the personal belongings of hundreds of residents. This lawsuit seeks to make whole Plaintiffs and those similarly situated for everything lost in the fire and all cognizable damages to the fullest extent allowed by law.

## PARTIES

1.

Lanz is a resident of Fulton County and submits to the jurisdiction of this Court.

2.

Greene is a resident of Fulton County and submits to the jurisdiction of this Court.

3.

Dessin is a resident of Fulton County and submits to the jurisdiction of this Court.

4.

Leija is a resident of Fulton County and submits to the jurisdiction of this Court.

5.

Lanz, Greene, Dessin, and Leija represent a putative class of similarly situated individuals who are residents of Fulton County and lived in Buildings One and Two at The Reserve at LaVista Walk at the time a fire started on the roof on November 10, 2023.

6.

LHNH LAVISTA LLC is a New Jersey limited liability company with its principal place of business in Jackson, New Jersey. This Defendant may be served by personal service of process upon its registered agent, Vcorp Agent Services, Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

7.

LHNH LAVISTA TIC II LLC is a New Jersey limited liability company with its principal place of business in Jackson, New Jersey. This Defendant may be served by personal service of process upon its registered agent, Vcorp Agent Services, Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

8.

LHNH LAVISTA TIC III LLC is a New Jersey limited liability company with its principal place of business in Jackson, New Jersey. This Defendant may be served by personal service of process upon its registered agent, Vcorp Agent Services, Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

9.

Silverpoint Management, LLC, is a New Jersey limited liability company with its principal place of business in Lakewood, New Jersey. This Defendant may be

served by personal service of process upon its registered agent, Vcorp Agent Services, Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

10.

Avenium Group, LLC, is a New Jersey limited liability company that is not registered to do business in Georgia with the Secretary of State. Its principal place of business is in Jackson, New Jersey. This Defendant may be served with personal service of process upon its registered agent, Yakov Stein, 2105 W. County Line Road, Ste. 3, Jackson, New Jersey 08527.

**JURISDICTION AND VENUE**

11.

This action has more than one hundred putative class members, the parties are minimally diverse, and the matter of controversy is in excess of $5 million.

12.

As a result, this Court has original diversity jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), (d)(5). *See also Standard Fire Ins. Co. v. Knowles*, 568 U.S 588 (2013).

13.

Venue is appropriate in the Northern District of Georgia, Atlanta Division, because "a substantial part of the events or omissions giving rise to the claim

occurred, or a substantial part of property that is the subject of the action is situated" within the bounds of the Atlanta Division, and all Plaintiffs reside therein. 28 U.S.C. § 1391; N.D. Ga. L.R. 3.1(B).

## OUT-OF-STATE INVESTORS PURCHASE THE RESERVE AT LAVISTA WALK WITH THE INTENTION TO PUT PROFIT ABOVE PEOPLE

14.

LHNH LAVISTA LLC, LHNH LAVISTA TIC II LLC, and LHNH LAVISTA TIC III LLC (collectively, "the LHNH Defendants") purchased The Reserve at LaVista Walk for $90 million in December 2021.

15.

Defendants financed $70 million of the purchase price and had investor funds of at least $17 million.

16.

Defendants are owned and operated by a common organization that is, or is associated with, Silverpoint Management, LLC ("Silverpoint").

17.

Silverpoint has been associated with numerous LHNH entities that owned numerous apartment complexes in Georgia,[1] North Carolina,[2] and, upon information belief, a number of other states.

18.

Upon information and belief, as of November 10, 2023, Silverpoint owned and operated, through several other companies, The Reserve at LaVista Walk and Alexander at the District, the latter of which is owned by LHNH Alexander, LLC.

19.

Upon information and belief, as of November 10, 2023, Silverpoint had divested itself of the other LHNH-owned properties in Georgia.

[1] These entities included, among others, LHNH Alexander LLC; LHNH Chatsworth LLC; LHNH Columns LLC; LHNH Creekside Apartments, LLC; LHNH Ellington Midtown LLC; LHNH Parkside Apartments LLC; LHNH PARKWAY VISTA LLC; LHNH Perimeter LLC; LHNH Riverhaus LLC; LHNH Terraces LLC; LHNH The Vine LLC; LHNH THE VUE LLC.

[2] These entities included, among others, LHNH – PP Apts. LLC; LHNH-86 LLC; LHNH BRENTMOOR LLC; LHNH – THE BRITTANY LLC; LHNH – Country Club Apartments LLC; LHNH Cresent Oaks LLC; LHNH Enterprise, L.L.C.; LHNH Heritage LLC; LHNH – Northwoods Townhomes NC LLC; LHNH-The Pines LLC; LHNH Summerlyn Place LLC.

20.

Upon information and belief, Defendants represent investors, purchase multi-family dwelling properties, and execute a blueprint of tasks aimed at cutting costs, increasing revenue, and creating the façade that they improved the property during their ownership.

21.

Among other things, Defendants cut costs by refusing to pay vendors and suppliers; cutting services such as security, garbage collection, groundskeeping, and pest control; and falsely and fraudulently taking funds from residents, refusing to give appropriate refunds, and/or auto-drafting funds that are not actually owed.

22.

Defendants' pattern and practice of acquiring and flipping properties has left a trail of havoc and destruction. Evidence of this pattern and practice includes a trail of lawsuits, which include:

(a) *44 Appliance & Supply Company, Inc. v. LHNH Alexander, LLC & Silverpoint Management, LLC*, Gwinnett State Court, Case No. 23-C-07919-S1 (collection for $29,324.36 by appliance supplier);

(b) *Alston v. Silverpoint Management, LLC*; Gwinnett Magistrate Court; Case No. 19M45890 (resident complaint related to pests and non-functioning equipment in unit);

(c) *Billingsly v. Silverpoint Management, LLC*; Gwinnett Magistrate Court; Case No. 23M38386 (resident complaint related to pests);

(d) *Salo v. Reserve at La Vista Walk & Silverpoint Management*; Fulton State Court; Case No. 23EV002570 (resident complaint related to false/fraudulent collection);

(e) *Simpson v. Avenimum Property Management*; Gwinnett Magistrate Court; Case No. 23M16756 (resident complaint related to pests); and

(f) Weatherly v. LHNH THE VUE, LLC, et al.; Dekalb State Court; Case No. 23A03595 (negligent security and wrongful death).

23.

Defendants carried out the same blueprint of cost-cutting at The Reserve at LaVista Walk.

24.

In an Holdfolio[3] investor video regarding The Reserve at LaVista Walk,[4] Yakov Stein – suspected manager of all Defendants and all LHNH entities referenced in footnote 1 above – stated that the apartment was an "A-plus-plus asset"; Holdfolio highlighted Mr. Stein's plan to "increase the rents and to force-appreciate" the asset; and boasted that, "from a deferred maintenance perspective, these units can survive another 10-15 years the way they are."[5]

25.

These comments by Mr. Stein were false and misleading, apparently with the intention to deceive investors.

26.

The truth, however, was that The Reserve at LaVista Walk was in dire need of security, maintenance and upkeep.

---

[3] Holdfolio identified itself as a partner of Mr. Stein.

[4] The video is available at https://youtu.be/eAPSOMRLhJA.

[5] The video also mentioned that 85% of the floors had been replaced or refurbished. Plaintiffs have photographs of substantial flooding damage in the complex, so this claim is incredulous.

**DESPITE DEFENDANTS' ACTUAL AND CONSTRUCTIVE KNOWLEDGE OF THE NEED TO PROPERLY REPAIR, MAINTAIN, SECURE, INSPECT, PATROL AND MANAGE THE APARTMENT COMPLEX, INCLUDING THE FIRE SUPPRESSION SYSTEM, DEFENDANTS FAILED TO DO SO**

27.

To cut costs, Defendants created a culture of frugality, ignored residents' complaints, and knowingly put residents at risk.

28.

Defendants refused to fix broken security doors, and homeless individuals were frequently inside the building, some even climbing the walls of the apartment complex to get to the upper parking decks and the roofs of the buildings.

29.

One resident who complained about the risks associated with homeless individuals inside the building was told by Defendants, through agents, that the complex had "compassion" so did not eject those people or otherwise prohibit their access to the building.

30.

Residents complained to Defendants, through agents, that residents and non-residents were able to access the roof, ignite fireworks, and discharge firearms.

31.

At least one resident reported tenant Charnelle Gunn as posing a safety threat to residents.

32.

Notwithstanding Defendants' knowledge that individuals were accessing the roof, discharging fireworks and firearms thereon, and that Charnelle Gunn was a safety threat, Defendants took no action to prevent roof access or to prepare for the possibility of fire on the roof.

33.

Before the summer of 2022, a vehicle crashed into the apartment complex damaging a portion of outer wall, exposing a water suppression system pipe and valve, and causing flooding.

34.

Upon information and belief, the vehicle collision into the apartment complex caused damage to the fire suppression system's wiring system and, thereafter, the apartment frequently had false fire alarms go off on so many occasions that the residents began to ignore them as management did nothing about them when the residents complaint about the alarms.

35.

The damaged outer wall from the vehicle crash allowed homeless people to access a valve to turn on a fire suppression system sprinkler head and shower in the water therefrom.

36.

Apartment employees identified a panel that would properly cover the pipe and valve, but Defendants refused to pay for it; instead, they locked the valve with a bike lock.

37.

Defendants also used bike locks for other purposes, such as locking a fire escape – that caused distress to a young woman with a five-month-old child trying to escape the fire – and locking a gate to a pool that posed the threat of chemical burns due to the improper application of pool chemicals.

38.

In June 2022, Century Fire Protection, LLC ("Century"), diagnosed two broken control valves that controlled the pressure within the fire suppression system.[6]

---

[6] Upon information and belief, fire personnel reported via radio that there was no pressure within the fire suppression system and aerial access via ladders were needed to

39.

Century warned Defendants that the broken control valves meant that the pressure within the fire suppression system could not be guaranteed or maintained.

40.

Upon information and belief, immediately after the two broken control valves were diagnosed, the fire suppression system failed inspection.[7]

41.

Upon information and belief, Century did not return to the apartment complex after June 2022 because Defendants refused to pay outstanding invoices and even threatened to foreclose on the property.

42.

Century and numerous other vendors filed liens on unpaid invoices that Defendants accumulated in their effort to re-sell the property for a substantial profit.

---

properly combat the fire. At 10:46 p.m. on November 10, 2023, fire personnel reported that the fire suppression system's standpipe was not flowing water.

[7] Plaintiffs are aware that the fire suppression system allegedly passed an inspection in December 2022. This is perplexing; however, Plaintiffs note that the Century lien is dated after the alleged inspection. The referenced inspection report has not yet been provided to Plaintiffs.

43.

On or about December 24-25, 2022, the fire suppression system froze and caused flooding again.

44.

Defendants were also aware of damaged and corroded sprinkler heads throughout the hallways of Buildings One and Two.

45.

Plaintiff Dessin posted a Google review in October 2023 stating, "[T]he most concerning issue is the non-functional fire sprinkler system within the complex. It has been down for over a year, leaving us at an extremely high risk in the event of a fire."[8]

46.

Plaintiffs and numerous residents complained extremely frequently about pests, mold, myriad security concerns, false fire alarms, and homeless people in the building – including some homeless people living in vacant units.[9]

---

[8] Compare this review to reviews of Alexander at the District in Atlanta, Northwoods Townhomes in Cary, North Carolina, and the mountain of other consistent and negative reviews about Silverpoint.

[9] This did not stop Defendants from filing many evictions against residents who paid rent *at least once* across LHNH properties.

47.

Plaintiff Lanz sent Defendants, through agents, a scathing resignation letter highlighting a vast list of complaints and concerns about the apartment complex.

48.

On October 4, 2023, Plaintiff Lanz sent an email to Defendants, through agents, noting "the second night this happened" and complained that "3 back-to-back alarms in the middle of the night" interfered with the residents' ability to sleep.

49.

Defendants had knowledge the fire alarm pull-down boxes and fire extinguishers had not been properly inspected and/or were not all operating.

50.

Defendants had specific knowledge that the fire suppression system was not adequate and not functioning.

51.

Defendants made the conscious choice to not repair the fire suppression system to maximize profits to investors.

52.

Residents lodged hundreds of complaints with Defendants and Defendants' agents and employees since Defendants purchased and began managing The Reserve

at Lavista Walk for, among other things, the following: intrusions into the complex via unsecured gates, broken doors, homeless people climbing the walls to the upper parking decks and roofs, fireworks being used on and near the roof adjacent to the visitor parking lot, residents and non-residents throwing parties with alcohol and loud music at the pool and other areas of the complex, hit and runs, assaults on residents and their guests by tenants and non-tenants alike, arson, vehicle vandalism and break-ins, drug dealers carrying automatic weapons through the complex and selling drugs from apartments rented to them by Defendants, and constant malfunctions of the fire suppression system.

53.

Defendants also failed to adhere to local, national and state rules, statutes and regulations with respect to the fire suppression system, including, but not limited to failing to maintain the required number and type of fire extinguishers throughout the premises, including, but not limited to, on the top level of the parking deck where the subject fireworks were thrown onto the adjacent roof where the fire started in this case, failing to have the fire extinguishers inspected, maintained and tested, and failing to train its staff on the proper use of the fire extinguishers or even where the fire extinguishers were supposed to be located.

54.

On October 24, 2022, a risk assessment that was performed by the underwriter for Defendants' insurance company informed Defendants that there were fire hazards present at the property.

**DEFENDANTS' LEASE AGREEMENT WITH THE RESIDENTS OF THE RESERVE AT LAVISTA WALK**

55.

Residents of The Reserve at LaVista Walk, including Plaintiffs, each entered into the same NAA form lease agreement with Defendant LHNH Lavista, LLC.

56.

Under the specific terms of the Lease, the residents and/or their guests were prohibited from using or maintaining at the apartment complex any material that may create a fire hazard, including, but not limited fireworks.

57.

Likewise, the terms of the Lease prohibited the residents and/or their guests from engaging in the following activities: behaving in a loud manner, disturbing the rights, health or safety of other tenants, guests, or Defendants' agents or employees, possessing or distributing drugs, engaging or threatening violence, and possession of a weapon, and discharging firearms at the complex.

58.

Engaging in prohibited conduct was a material breach of the Lease, giving Defendants the right to terminate the tenant's right of occupancy.

59.

The Reserve at LaVista Walk neighbored a retail "76" gas station located at 2319 Cheshire Bridge Road, Atlanta, Georgia. See O.C.G.A. § 26-10-2(b)(3)(C)(iii) (unlawful to discharge fireworks within 100 yards of a retail gas station storing in excess of 500 gallons of gasoline).

**DEFENDANTS WERE ON NOTICE OF AT LEAST TWO INCIDENTS WHERE TENANTS DISCHARGED FIREWORKS ON THE ROOF, ONE OF WHICH INVOLVED TENANT CHARNELLE GUNN**

60.

On or around July 4, 2023, tenant Frida Flores woke up in the evening to loud fireworks at the Reserve at Lavista Walk. When she looked out of her window, she observed and filmed with her phone fireworks being used on the parking deck adjacent to the roof where the fireworks ultimately caused the fire 4 months later on November 10, 2023.

61.

A day or two later, another tenant, Kenkero Peterson, observed tenant Charnelle Gunn speeding through the parking deck and discharging fireworks with her son from the same parking structure onto the same roof.

62.

A day or two later, Ms. Peterson lodged a formal complaint with the property manager on-duty, Deyse Mejia, and other agents of Defendants who were present in the Leasing Office that Ms. Gunn's conduct presented a fire hazard.

63.

Prior to that time, Ms. Peterson had lodged other complaints about Ms. Gunn's dangerous and unsafe driving in and around the complex, including, but not limited to the parking deck.

## DEFENDANTS WERE ON NOTICE OF NUMEROUS CRIMES ON THE PREMISES INCLUDING ARSON AND DECLINED REQUESTS FOR SECURITY DUE TO COST

64.

At least by August 2022, the Defendants recognized they had a serious security problem at The Reserve at LaVista Walk. On August 17, 2022, the head property manager for the complex, Melvin Coleman, sent an e-mail from pm@lavistaga.com with some security proposals.

65.

The same day, David Helfgott, VP of Operations for Silverpoint Management responded with a request that the companies provide an assessment of what they feel is needed. Although he noted that local management believed strongly that the apartment complex needed armed guards, he wanted assessments from prospective security companies before agreeing to spend money for the requested armed security guards.

66.

On August 24, 2022, an assistant property manager, Nakia Glenn, e-mailed two security assessments to Melvin Coleman, noting that both companies recommended two guards patrolling seven days a week but that this would be pricey.

67.

One of the security assessment reports provided to Defendants' management was prepared by DBest Security. The DBest Security report assessed the overall security threat as "moderately high," noting that prior incidents included "arson," "minor arson," "property damage," and "disorder."

68.

On October 25, 2022, Coleman sent an e-mail in response to an inquiry from Stephanie Johnston, a regional manager with Silverpoint, confirming there was still "no physical security" at The Reserve at LaVista Walk.

69.

On December 20, 2022, Coleman sent an e-mail to Johnston inquiring if "we could investigate hiring a security company temporarily until the activity on the property changes" and noted that the "amount of activity" on Friday, Saturday, and Sunday nights was "too much for one person" and "just last night three vehicles were broken into."

70.

Johnston replied, "I understand your concern and am with you that we need to do something, however the funds are not there to hire a security company."

71.

Defendants failed to adequately address the severe security and safety issues that they were aware of (including known acts of arson) despite their own agents' and/or employees' knowledge that the apartment complex was in dire need for additional security for the protection of the residents of The Reserve at Lavista Walk.

**THE NOVEMBER 10, 2023 FIRE**

72.

On the night of November 10, 2023, The Reserve at LaVista Walk caught fire. According to reports, the fire originated on the roof of Building One from a firework that Charnelle Gunn threw from the parking deck in the very same manner that Kenkero Peterson had warned Defendants about in July 2023.

73.

Emergency personnel were notified of the fire at approximately 10:30 p.m., but the earliest evidence of a fire alarm sounding is 10:53 p.m. According to a fire incident report, the fire suppression system failed to provide adequate water pressure and two of the standpipes failed to function.

74.

On the night of the fire, Jennifer Sequira Tercero, an Assistant Manager for Defendants who lived at the complex, went up to the top floor of the visitor parking lot where the fire was initially located with a small fire extinguisher that was located in her apartment.

75.

After she reached the top of the stairs, she walked over 100 feet to where the fire was burning towards the back of the parking lot on the roof adjacent to the

parking deck and actively looked for additional fire extinguishers, but she was unable to locate any other fire extinguishers even though such extinguishers were required per applicable law.

76.

Ms. Tercero had not received any training on how to operate fire extinguishers and had not been informed as to where the fire extinguishers were located at the complex, including on the visitor parking deck.

77.

When Ms. Tercero reached the fire, it was very small and circular like a ring of fire, and she believed that the fire could have been contained or extinguished very easily even though she had no experience in extinguishing fires had she had access to additional fire extinguishers.

78.

Ms. Tercero handed her small fire extinguisher to the brother of one of the residents at the complex who was standing by the fire, and he attempted to put out the fire with the extinguisher, but the extinguisher ran out of its extinguishing substance within what seemed a very few minutes because it was so small. As such, they were unable to extinguish the fire and could not locate any other extinguishers on the deck or anywhere near the fire in violation of appliable laws that required fire

extinguishers to be present.

79.

Although there were two individuals in management in addition to Ms. Tercero at Lavista that night, on information and belief, none of these individuals went to the scene of the fire or attempted to extinguish the fire as there simply was not enough staff at Lavista to handle the evacuation and the fire at the same time.

80.

During an inspection of the deck on November 23, 2023, fire extinguishers were missing from several storage cabinets closest to the vicinity of the fire where they should have been housed.

81.

The absence of these fire extinguishers prevented the fire from being extinguished on the roof prior to it spreading throughout Building One.

82.

On information and belief, the roof membrane failed to meet Class A or B fire resistance standards as defined by ASTM E108 and UL 790.

83.

Apartment leasing agents, all of whom were on-site although not all of them lived on-site,[10] manually pulled a fire alarm at a pull box – it is unclear if the fire alarm was not functioning from negligence or had been intentionally disabled as a result of complaints regarding the false alarms.

84.

Prior to November 10, 2023, the fire alarm had gone off numerous times and Defendants falsely told residents that the false alarms were occurring because the system was being tested.

85.

Dozens – reportedly by one resident, more than one hundred – false alarms from the time of the vehicle collision until November 10, 2023, caused many residents to disregard the fire alarm.

86.

[10] Residents report that the two leasing agents who do not live on-site are infrequently, if ever, seen at the complex after 6:00 p.m., and residents found it extremely peculiar that they were on-site at the time of the fire before fire personnel.

Likely knowing that the false alarms created a "boy that cried wolf situation," an Atlanta Police Department ("APD") officer who also lived in the building went door-to-door to inform residents the building was on fire.

87.

The APD officer did not have time to take care of his own apartment unit due to his decision to inform residents of the fire; due to his heroism and sacrifice, no one died in the fire, but his pet cat died, and he lost all of his personal belongings.

88.

By the end of November 11, 2023, Building One had collapsed and was known to be a total loss and in need of condemnation.

89.

Building One residents could not return to their units.

90.

Shortly after the fire, Building Two residents were told that they could not return to the property.

**EVEN AFTER THE FIRE, DEFENDANTS AND INVESTORS CONTINUED TO FOCUS ON PROFIT ABOVE PEOPLE**

91.

After the fire, Defendants sent an email to residents of Buildings One and Two stating that Building One residents did not need to pay rent, but was silent as to whether Building Two residents needed to pay rent.

92.

Due to the concern that Defendants would auto-draft future rent payments, residents began removing their credit card information from the online payment portal.

93.

Online payment portal access was disabled for some residents, so many of those individuals had to contact their banks to dispute any future charges from the apartment.

94.

Defendants, via their vendor Conservice, LLC, sent rent and service charge bills to Building Two residents after the fire while said residents remained unable to enter the building or access their belongings.

95.

December 2023 rent was auto drafted from at least one resident's bank account.

96.

On information and belief, Defendants did not return pro-rated rent for November 11, 2023, forward, even though Buildings One and Two was not accessible and residents of all units had been displaced.

97.

Defendants have not returned security deposits or any other funds that were not associated with past rent legitimately owed to Defendants.

98.

Defendants established a GoFundMe seeking $5 million for the residents related to the fire and, to date and to Plaintiffs' knowledge, none of those funds have been given to residents.

99.

Although residents were in dire need of the funds held by Defendants from the GoFundMe, security deposits, and rent beyond November 11, 2023 – some residents continued to sleep in their cars for many days as they were unable to secure replacement housing.

100.

The apartment's TikTok page followed TikTok accounts of residents after the fire, making those individuals feel intimidated and/or that the action was otherwise inappropriate.

101.

Defendants, through agents, notified Building Two residents that residents of two floors could access their belongings on November 22, and residents of the other two floors could access their belongings on November 23, but would first have to sign a release that would not be provided in advance of their arrival at Building Two.

102.

Subsequently, Defendants, through agents, changed the schedule of access to Building Two several times. Some residents secured moving vans for earlier in the week and had their scheduled time moved to after Thanksgiving, requiring them to incur additional charges with moving companies.

103.

On November 20, 2023, Defendants attempted to coerce residents into signing a full liability release that included the waiver of "the right to sue the owner" to allow them to enter Building Two to retrieve whatever is left of their belongings, including family heirlooms and sentimental items.

104.

On November 20, 2023, Defendants also threatened residents with arrest if they attempted to enter the property to retrieve their belongings without signing the coercive release.

105.

Under duress, some residents – although not Plaintiffs – may have signed the release.

106.

In a video recording following the fire, Meija stated that the apartment is understaffed because the employees were "emotionally unavailable."

107.

Due to the understaffing and failure to ensure appropriate security, Building Two was looted with numerous residents complaining that their belongings were either stolen or vandalized before they were allowed to enter their apartments to retrieve their personal belongings. This delay prevented many residents from being able to file timely police reports.

108.

Defendants engaged BluSky Restoration Contractors, LLC ("BluSky") to demolish and/or restore the property without allowing Plaintiffs to inspect the property which constituted spoliation of evidence.

109.

Upon information and belief, Defendants altered the scene to destroy evidence and hamper Plaintiffs' ability to investigate this matter.

110.

After the fire rendered the residents homeless, Defendants, using the residents' personal data, unjustly enriched themselves by selling the data to the highest bidding company to use the data to send marketing materials to the residents to convince them to sign leases with this company.

111.

Numerous residents were surprised to learn that Defendants misrepresented the nature of the renters' insurance required by the complex.

112.

Although Defendants informed residents that the monthly renters' insurance required by the apartment is all that is needed[11] – and even encouraged one resident to terminate her other renters' insurance in October 2023 – the referenced insurance only covered the Defendants' loss; it did not cover loss claims by residents.

113.

As a result of Defendants' actions, some residents were not covered by renters' insurance.

## CLASS ACTION ALLEGATIONS

114.

Plaintiffs bring this action as a putative class action and proposes one class.

115.

Plaintiffs propose the following class, while reserving the right to modify this definition:

All residents at The Reserve at Lavista Walk apartment complex as of November 10, 2023, as identified in the Defendants' leasing records. Charnelle Gunn and

[11] Plaintiffs have been informed of renters' insurance premiums varying from $15.00 to $25.00 monthly.

Robert Stokes are excluded from the class.116.

Plaintiffs propose certification on all issues, while reserving the right to seek, in the alternative, certification as to any specific issue, claim, or defense.

117.

This action has been brought and is properly maintained as a class action as it satisfies the numerosity, commonality, typicality, and adequacy-of-representation requirements of Fed. R. Civ. P. 23.

118.

Plaintiff alleges that hundreds of individuals who resided at The Reserve at LaVista Walk on November 10, 2023, have been displaced and lost substantial personal property resulting in damages related to the replacement cost of personal property, loss of use of said property, and other compensatory damages.

119.

The class members are so numerous that joinder is impracticable. Upon information and belief, Buildings One and Two at The Reserve at LaVista Walk had 284 units, approximately 74.56% occupancy, and approximately 243 residents.

120.

Plaintiffs' claims are typical of the claims of the putative class. Because

Plaintiffs were harmed by the same fire resulting from Defendants' negligence that harmed the class, Plaintiffs were subject to conduct that is typical of the rest of the class.

121.

Plaintiffs would adequately protect the class's interests. Plaintiffs have genuine interest in protecting the rights of the class and Plaintiffs' counsel is experienced in handling complex class actions. Because Plaintiffs seek recourse related to a fire that harmed all class members, the interests of Plaintiffs and the class are aligned.

122.

Questions of law and fact common to the putative class exist that predominate over questions affecting only individual members including but not limited to whether Defendants were negligent and reckless by failing to protect residents from the known fire-safety risk presented by Charnelle Gunn, by failing to train their employees in fire safety, and by refusing, for financial reasons, to secure a functional fire suppression system. A finding of liability in favor of Plaintiffs would establish Defendants' liability on behalf of all class members damaged by the fire.

123.

A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Given the dollar amounts at stake, a class action is likely the only way for Plaintiff and other class members to obtain any redress.

124.

The prosecution of separate actions by or against individual members of the class would create a risk of "(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; [and] (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]" Fed. R. Civ. P. 23(b)(1).

125.

Alternatively, the Court should certify a class on the issue of liability pursuant to Fed. R. Civ. P. 23(c)(4).

## COUNT ONE

### Negligence, Gross Negligence, and Negligence Per Se

126.

Plaintiffs hereby re-allege and incorporate paragraphs 1-125 of this Complaint as if fully set forth herein.

127.

Defendants had a legal duty to exercise reasonable or ordinary care to protect the residents of The Reserve at LaVista Walk from unreasonable risk of harm from fire.

128.

Defendants breached their legal duty by failing to ensure the fire suppression system was operational and working properly.

129.

Defendants are "responsible for damages arising from defective construction or for damages arising from the failure to keep the premises in repair." O.C.G.A. § 44-7-14.

130.

Defendants' negligence caused Plaintiffs and those similarly situated to suffer significant loss of personal property, loss of use of said property, lost wages, inconvenience, and compensatory damages.

131.

The Defendants' actions show wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs and the putative class to an award of attorney fees and punitive damages pursuant to applicable law.

132.

Defendants acted in bad faith in the underlying transaction by pursuing profits over safety and have caused Plaintiffs and the putative class unnecessary trouble and expense. As such, Defendants are liable for Plaintiffs' expenses of litigation, including reasonable attorney fees.

**COUNT TWO**

**Premises Liability**

133.

Plaintiffs hereby re-allege and incorporate paragraphs 1-132 of this Complaint as if fully set forth herein.

134.

At all times material to this action, Plaintiffs were tenants of The Reserve at Lavista Walk (the "Premises").

135.

At all times material to this action, Defendants had a non-delegable duty to properly repair, maintain, inspect, secure, patrol, and manage the Premises.

136.

While Defendants owned and/or managed the Premises, Defendants breached these non-delegable duties and otherwise negligently repaired, maintained, inspected, secured, patrolled, and manage the Premises despite their actual and constructive knowledge of the need to do so.

137.

Prior to the fire of November 10, 2023, Defendants had actual and/or constructive knowledge of crimes such as arson, robbery, drug distribution, vandalism, and the possession and discharge of firearms.

138.

Prior to the fire of November 10, 2023, Defendants had actual knowledge that Charnelle Gunn had illegally set off fireworks on the parking deck where the fire ultimately occurred and threw them onto the roof in violation of her lease with conscious indifference to the fire hazard that she created, dangerously and recklessly drove her vehicle in and around the Premises endangering the other tenants and their guests, and otherwise invited and caused crimes to be committed on the Premises and in and around her apartment.

139.

Prior to the fire of November 10, 2023, one of Defendants agents and/or employees noted in an email to Robert Stokes, Charnelle Gunn's uncle, co-tenant, and who also ignited the fireworks that caused the November 10, 2023 fire, that she was aware that Ms. Gunn brought crime onto the property, but refused to allow Ms. Gunn and Mr. Stokes to terminate their lease without paying Defendants the required termination fees. As such, Ms. Gunn was allowed by Defendants to remain a tenant.

140.

Despite having direct knowledge of Charnelle Gunn's illegal and unsafe activities and her endangerment to the other tenants, Defendants failed to take any action whatsoever to prevent her from continuing these activities such as the eviction of Charnelle Gunn and otherwise failed to warn the other tenants of the danger posed by Ms. Gunn.

141.

Despite having actual and constructive knowledge of the numerous crimes that were occurring almost daily at the Premises, including arson, and being informed by security experts that armed guards were required at the Premises and that other security measures needed to be undertaken, Defendants made the

conscious and negligent decision to refrain from undertaking these security measures based on cost alone and chose to continue to allow the tenants to be subjected to the daily risk of harm that Defendants knew could result from the crimes and other unsafe activities that took place on the Premises.

142.

Prior to the fire of November 10, 2023, Defendants had a non-delegable duty to maintain a properly working fire suppression system, to equip the Premises with legally required fire extinguishers, and to train its staff how to operate the fire suppression system and fire extinguishers and where the fire extinguishers were located.

143.

Despite possession of active and constructive knowledge of fireworks being used on the Premises by Ms. Gunn and various acts of arson and the danger of what could occur without a properly trained staff, an improper fire suppression system that was in dire need of repair, and without the legally required number and type of certified fire extinguishers, Defendants made the conscious and negligent decision to refrain from fulfilling these non-delegable duties.

144.

Defendants negligently failed to warn Plaintiffs and the putative class about the existence of the aforementioned crimes, lack of security, a fire suppression system that was in disrepair, the lack of legally required fire extinguishers, and that its staff was not trained in basic fire prevention and containment practices.

145.

At all times pertinent hereto, Defendants and their agents and/or employees had superior knowledge of the unsafe condition of the Premises as described above that proximately caused Plaintiffs to be rendered homeless, the loss of their personal property, and other damages as described herein.

146.

Defendants failed to take appropriate actions to remedy or reduce the danger to their tenants and allowed the dangerous environment on the Premises to continue to exist unabated.

147.

Because Defendants had knowledge of or, in the exercise of reasonable care, should have had knowledge of the dangerous environment of the Premises and the lack of training of its staff, Defendants are liable for the negligent supervision,

hiring, training and retention of their employees and agents operating on the Premises and otherwise vicariously liable for the actions and/or omissions of their employees and/or agents as described herein via the doctrine of *respondeat superior*.

148.

Defendants' negligent failure to fulfill their non-delegable duties to keep the Premises safe and free of hazards for their tenants caused Plaintiffs and those similarly situated to suffer significant loss of personal property, loss of use of said property, lost wages, inconvenience, and compensatory damages.

149.

Defendants acted with willful misconduct, malice, fraud, oppression, wantoness, and an entire want of care raising the presumption of a conscience indifference to the consequences. Accordingly, Plaintiffs and those similarly situated are entitled to recover punitive damages from Defendants pursuant to O.C.G.A. § 51-12-5.1.

**COUNT THREE**

**Nuisance**

150.

Plaintiffs hereby re-allege and incorporate paragraphs 1-149 of this Complaint as if fully set forth herein.

151.

Defendants' failure to properly inspect, maintain, and repair the Premises created the hazardous conditions that ultimately caused the fire on November 10, 2023 and the inability of their staff and the Atlanta Fire Department to extinguish, maintain or control the fire, its spread and ultimate destruction of the Premises.

152.

The hazardous conditions of the Premises, created by the inadequate maintenance and repair of the Premises began at the time of Defendants' ownership, management and control of the Premises and continued in time forward that it constituted an ongoing and continuing nuisance to the tenants of The Reserve at Lavista Walk and their guests.

153.

Defendants knew, or in the exercise of ordinary and reasonable care, should have known of the existence of the nuisance, created by the improper repair, maintenance, and/or management of the Premises, but Defendants failed to correct the nuisance within a reasonable time.

154.

Defendants' failure to correct the nuisance was the proximate cause of the damages suffered by Plaintiffs and the putative class members.

155.

Plaintiffs are entitled to all nuisance damages against Defendants as allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a TRIAL BY JURY and the following relief:

(a) Compensation for all financial losses that resulted from the fire, including the cost to replace all destroyed personal property, loss of use of said property, lost wages for time missed from work to relocate, and expenses related to purchasing replacement items, temporary substitute housing, and permanent substitute housing;

(b) Compensatory damages in an amount to be determined by the enlightened conscience of the jury to fully compensate Plaintiffs and those similarly situated;

(c) Award of costs and expenses of this action, together with reasonable attorney and expert fees;

(d) Punitive damages in an amount to be determined by the enlightened conscience of the jury sufficient to punish Defendants for their conduct

toward Plaintiffs and those similarly situated and deter Defendants from similar conduct in the future;

(e) Judgment against Defendants for damages incurred by Plaintiffs and those similarly situated;

(f) Judgment against Defendants in an amount to fully and adequately compensate Plaintiffs and those similarly situated;

(g) An award of pre-judgment and post-judgment interest;

(h) A trial by jury on all issues triable to a jury; and

(i) Other and further legal and equitable relief as the Court deems just and proper.

Respectfully submitted this 4th day of December, 2025.

THE BROSNAHAN LAW FIRM



Kenneth W. Brosnahan, Esq.
Georgia State Bar No. 086345
E-mail: kwb@brosnahan-law.com
Linda G. Carpenter, Esq.
Georgia State Bar No. 111285
E-mail: lgc@brosnahan-law.com
**Attorneys for Plaintiff**

31 Lenox Pointe, N.E.
Atlanta, Georgia 30324
Tel: (404) 853-8964
Fax: (678) 904-6391

By: /s/ Douglas H. Dean
Georgia Bar No. 130988
Attorney for Plaintiffs
Dean Thaxton, LLC
601 E. 14th Avenue (31015)
Post Office Box 5005
Cordele, Georgia 31010
T: (229) 271-9323
F: (229) 271-9324
E: *doug@deanthaxton.law*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing SECOND AMENDED CLASS ACTION COMPLAINT has been prepared with 14-point Times New Roman font, which is one of the font and point selections approved by this Court in Local Rule 5.1(B).

This 4th day of December, 2025.

THE BROSNAHAN LAW FIRM



______________________________
Kenneth W. Brosnahan, Esq.
Georgia State Bar No. 086345
E-mail: kwb@brosnahan-law.com
Linda G. Carpenter, Esq.
Georgia State Bar No. 111285
E-mail: lgc@brosnahan-law.com
**Attorneys for Plaintiff**

31 Lenox Pointe, N.E.
Atlanta, Georgia 30324
Tel: (404) 853-8964
Fax: (678) 904-6391

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date electronically filed the foregoing SECOND AMENDED CLASS ACTION COMPLAINT with the Clerk of Court using the CM/ECF system which will automatically provide notice of such filing via electronic mail to the following attorneys of record:

R. Matt Shoemaker
JONES CORK, LLP
Truist Bank Building
435 Second Street, Fifth Floor
Post Office Box 6437
Macon, Georgia 31208
*matt.shoemaker@jonescork.com*

This 4th day of December, 2025.

THE BROSNAHAN LAW FIRM



Kenneth W. Brosnahan, Esq.
Georgia State Bar No. 086345
E-mail: kwb@brosnahan-law.com
Linda G. Carpenter, Esq.
Georgia State Bar No. 111285
E-mail: lgc@brosnahan-law.com
**Attorneys for Plaintiff**

31 Lenox Pointe, N.E.
Atlanta, Georgia 30324
Tel: (404) 853-8964
Fax: (678) 904-6391